**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **BRENDA MCCRACKEN,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | 11 C 8112 |
| v. ) | |
| ) | **Judge Ronald A. Guzmán** |
| **U CHICAGO ARGONNE LLC,** ) | |
| ) | |
| **Defendant.** ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff alleges that defendant discriminated against her on the basis of her age, race and sex and retaliated against her for her complaints of discrimination in violation of Title VII and the Age Discrimination in Employment Act ("ADEA"). Argonne has filed a Federal Rule of Civil Procedure ("Rule") 56 motion for summary judgment. For the reasons set forth below, the Court grants the motion.

**Facts**

In 2009, plaintiff applied but was not hired for an environmental health and safety ("EHS") manager position with Argonne. (Def.'s Ex. B, Pl.'s Dep. at 26.) Argonne did, however, hire her as a nuclear project safety manger for a one-year term starting November 16, 2009. (*Id.* at 29-30, 71.) Plaintiff worked in the Alpha Gamma Hot Cell Facility ("AGHCF") and reported to Mike Sodarro and Jeff McGhee, who reported to Cynthia Rock. (*Id.* at 54-57.)

Kurt Salter, a white male who "is like 35 years old," was also a nuclear project safety manager at AGHCF. (*Id.* at 74, 77-78.) Unlike plaintiff, Salter had "all kinds of access" to Rock, was invited to management meetings by her, participated in Rock's Safety Day program and was

allowed to use work time to study work for his Industrial Hygiene Certification ("IHC"). (*Id.* at 74-76, 80-84.)

Sometime before April 19, 2010, plaintiff applied for a nuclear safety specialist position in Argonne's Decontamination and Demolition Unit ("D&D"), which was a permanent position. (*Id.* at 100-02.) Plaintiff was interviewed by Kelvin Davis, who would be her supervisor, and Chuck Fellhauer, who was Davis' supervisor. (*Id.* at 102-03.) After she left AGHCF, Argonne promoted Salter to the EHS manager position in AGHCF for which plaintiff had previously applied. (*Id.* at 120-23.)

On April 19, 2010, plaintiff did not report directly to D&D. (*Id.* at 117-19, 125-26.) Rather, she started the day cleaning out her office at AGHCF and reported to D&D at 11:00 a.m. (*Id.* at 119, 125, 135-36; *see* Def.'s Ex. C, Pl.'s Journal at 3.) When she got there, Davis took her to an office that contained some small printer tables and a chair, but no desk, computer or telephone. (Def.'s Ex. B, Pl.'s Dep. at 129-30, 138-40.) She complained to Davis about the office and asked if she could use an office across the hall, which was fully equipped and was unoccupied. (*Id.* at 140-144; Def.'s Ex. C, Pl.'s Journal at 3-4.) Davis told her to "stay put." (Def.'s Ex. C, Pl.'s Journal at 4.)

Plaintiff spent the rest of April 19, and most of April 20, and 21, finishing work from AGHCF and preparing for the Argonne Women's Conference, a volunteer project she accepted while at AGHCF. (*See id.* at 3-15.) On the afternoon of April 21, 2010, she told Davis that she had previously committed to give a presentation at an AGHCF safety meeting. (*Id.* at 15.) Davis became angry, told her she should go back to AGHCF to see if they had full-time work for her there, and "stormed out" of her office. (Def.'s Ex. B, Pl.'s Dep. at 137-38, 174.)

About a week after she started, defendant installed a desk, computer and telephone in plaintiff's office. (*Id.* at 154-55.) At around the same time, another nuclear safety project specialist, Colin Murdoch, started in D&D, and was given the unoccupied office plaintiff had asked to use. (*Id.* at 143-46; Def.'s Ex. C, Pl.'s Journal at 21.)

On April 26, 2010, plaintiff overheard Fellhauer discussing a project with Phil Matton, another manager, on which three female employees were working. (Def.'s Ex. C, Pl.'s Journal at 24; Def.'s Ex. B, Pl.'s Dep. at 201-06.) Fellhauer told Matton they were "going to have to get the girls out of the room," to discuss the project. (Def.'s Ex. B, Pl.'s Dep. at 201-06.)

At 5:30 p.m. on April 27, 2010, plaintiff emailed Diversity Officer ("DO") Butts and asked to meet with him. (Def.'s Ex., C, Pl.'s Journal at 29.) A few minutes later, she emailed Davis a list of the D&D training segments she had completed and those she had yet to complete. (*Id.* at 30.) At 6:26 p.m., Davis asked her to meet with him after the next morning's briefing. (*Id.*) At 8:49 p.m., DO Butts told plaintiff he would contact her the next day to set up a meeting. (*Id.* at 30.) At 11:59 p.m. that night, plaintiff sent the following to Butts:

> . . . . I would like to talk with you as soon as possible. I feel very uncomfortable with the way I am being treated. I was only working for Kelvin Davis for three days when he got angry because I was trying to close out some work from my previous job in the AGHCF. He told me that I could go back to AGHCF, and see if they had full time work for me. He's had me working at a tiny computer desk in a dingy, empty office the HP technicians used to be in. When I asked why he wasn't putting me in the office the previous safety person had, he told me I was staying put. Then yesterday, at the end of the workday, I hard Chuck Felhauser [sic] tell Phil Matton that they "need to get the girls out of the room and talk about this." One of my respected professional colleagues has been working very dilegently [sic] with them, and it's offensive to hear her referred to as a "girl" that needs to leave the room so they can talk. I believe that statement reflects their attitude toward me, because I am being treated differently than the gentleman who had this position before me. I'm not being treated like a professional, and I'm very upset about it.

(*Id.* at 31.)

3

After the morning briefing the next day, plaintiff told Davis that she was upset by his comment about her seeking work at AGHCF and was going to speak to DO Butts about it. (Def.'s Ex. C, Pl.'s Journal at 32; Def.'s Ex. B, Pl.'s Dep. at 179.) Davis said "[N]o . . . , I want you to . . . meet me in Fellhauer's office." (Def.'s Ex. B, Pl.'s Dep. at 179.) Plaintiff refused, saying she did "not feel comfortable doing that" and was "going to talk to the [DO] and ask him to come with [her] to the meeting." (*Id.* at 179-81.)

Shortly thereafter, plaintiff and DO Butts met with Fellhauer and Davis. (Def.'s Ex. C, Pl.'s Journal at 32-33.) During the meeting, Fellhauer told plaintiff she had not been given the empty office because he had set it up for Murdoch in anticipation of his arrival. (Def.'s Ex. C, Pl.'s Journal at 32-33.) Fellhauer denied making the "girls" comment and accused plaintiff of being chronically late to and improperly dressed for morning briefings. (*Id.*; Def.'s Ex. B, Pl.'s Dep. at 192-93.) Moreover, Davis said plaintiff had been insubordinate when she went to get DO Butts instead of going to Fellhauer's office as he had instructed, and DO Butts agreed. (*Id.*; Def.'s Ex. B, Pl.'s Dep. at 196-97.) Plaintiff felt that the meeting was an attack on her, not a response to her complaints. (Def.'s Ex. C, Pl.'s Journal at 32-33; Def.'s Ex. B, Pl.'s Dep. at 191-92.)

At 9:30 a.m. on May 10, 2010, Employee Relations Manager Darryl Howe called plaintiff and asked her to meet with him later that day. (Def.'s Ex. C, Pl.'s Journal at 49.) She agreed to do so, but left work shortly thereafter because she was sick. (*Id.* at 52.) Howe rescheduled the meeting for the next morning, and plaintiff agreed to attend though she was still ill. (*Id.*) During the meeting, Howe asked plaintiff to recount the time line of her transfer, including when she was offered the D&D job, when she accepted it, what time she reported to the job on her first day and what day she received a telephone and computer. (*Id.* at 52-53.) Because she was still ill and could

4

not answer Howe's questions without consulting her notes, he agreed to continue the meeting another day. (*Id.*) Plaintiff was out sick for rest of the week. (*Id.* at 51, 58-59.)

Plaintiff returned to work on May 17, 2010, but did not call Howe to reschedule the meeting. (*Id.* at 61.) The next morning, Davis told her Howe wanted to meet with her at 11:00 a.m. (*Id.*) Plaintiff went to the meeting but says Howe did not let her discuss any of her complaints. (*Id.*)

On May 20, 2010, during the morning briefing, Davis told a contractor that the fire watch employees had to wear the same personal protective equipment ("PPE") as the welders. (*Id.* at 62.) Plaintiff says: "[Davis'] instructions were wrong. Most entry level safety professionals would know better than to make a call like he did. I was embarrassed for him. I'm sure he mst have overheard the Fire Watch mumble that they were going to have to talk about that." (*Id.*) Afterward, during a meeting with Matton and Davis concerning the PPE issue, plaintiff said she did not think the fire watch employees should have to wear the same PPE as the welders. (*Id.*; Def.'s Ex. B, Pl.'s Dep. at 166-72.) At the point, Davis "stormed out" of the meeting. (Def.'s Ex. B, Pl.'s Dep. at 172.)

Later that day, plaintiff went to inspect the welding area. (Def.'s Ex. C, Pl.'s Journal at 63.) The fire watch employee on site told her she had to leave because she was not wearing required PPE – leather gloves. (*Id.*; Def.'s Ex. B, Pl.'s Dep. at 184-87, 220-21.) Though plaintiff contends that observers were not required to wear leather gloves, she complied with the fire watch employee's instruction. (Def.'s Ex. B, Pl.'s Dep. at 185-90.) As she was leaving the site, the superintendent told his safety manager to talk to Davis, not plaintiff, about any safety issues. (*Id.* at 189-90.)

At 4:25 p.m. on May 20, 2010, plaintiff sent the following email to Davis, Fellhauer, Butts and several high management officials of Argonne:

5

> . . . . This afternoon, right in front of me, the [contractor's] Superintendent told the . . . Safety Manager that he was not to talk to me about any problems that he has, they are expected to go straight to Kelvin Davis.
>
> My supervisor, Kelvin Davis[,] told me that I have to be in the field 75% of my day.
>
> How am I supposed to do my job as safety specialist when I have to spend 75% of my day in a working environment where the employees have been instructed not to talk with me about any problems?
>
> The description for this position does not even come close to requiring 75% of my day spent in the field. So far, the only work that I've been assigned is a lengthy daily safety inspection of the 330 demolition site that is four pages long. Now, my supervisor is directing me to complete a weekly safety inspection that is encompassed by the four page inspection that I do every day. Kelvin also instructed me that I can no longer share my safety inspection with the . . . Safety Manager at the 330 demolition site.
>
> I have 20 years experience working in the field of Safety, IH, and Radiation Protection. I have a M.S. in Hygiene from the University of Pittsburgh, Graduate School of Public Health. I graduated at the top of my class, and won an award from the Health Physics Society for my Master's thesis. Last year, I was President of the Three Rivers Chapter of the American Society of Safety Engineers, and I'm still an active member of the Executive Board.
>
> According to the job description for this potion, I expected some challenging work.
>
> I enjoy field work very much, but a safety professional cannot be effective if the employees have been instructed not to talk with them, [as here].

(Def.'s Ex. C, Pl.'s Journal at 68.) When she did not receive a response by the next afternoon, plaintiff sent the email again. (*Id.* at 69-70.)

> At 6:44 a.m. on May 24, 2010, Davis sent an email to Matton, Fellhauer and Howe that said:
>
> [Plaintiff] was briefed on the demolition JSA [Job Safety Analysis] on 5/20/10, which she had read and signed off on. The activities to perform were welding and cutting on a [sic] multi-processor equipment. Two welders and one fire watch . . . were performing tasks. [Plaintiff] had been briefed on the task and wanted to observe the welding and cutting operations. The JSA states that the PPE required for all personnel: tinted safety eyeglasses, steel toed boots, fire retardant coveralls, a hard hat and leather gloves. Upon arrival to the job site, [plaintiff] was observed not

6

>wearing leather gloves as was dictated by the JSA. No other gloves were available at the job site, the fire watch asked [plaintiff] to exit the area. . . .

(*Id.* at 71.) Immediately after, Davis asked plaintiff via email to "review the JSA cutting and welding for the project," so they could discuss it later in the day. (*Id.*) Plaintiff says she did so, and the JSA "did not say that [she] had to wear leather gloves while conducting safety inspections." (*Id.*)

An hour later, plaintiff sent another email to Argonne upper management, saying: "In light of [Davis'] behavior – walking out of a safety discussion where I was trying to express a differing professional opinion – and his direction . . . [to contractors] not to talk with me about problems . . . . I have serious concerns about the position [Davis] put me in as Safety Specialist on this project . . . ." (*Id.* at 72.) She attached to it an email from the contractor's superintendent that says:

>I would like to assure you that at no point have I ever directed or will I ever direct any of my personnel or contractors to not speak to [plaintiff] . . . .
>
>I can only think of one particular instance . . . which [plaintiff] possibly could have misconstrued. [On May 20, 2010], I did instruct one of my Contractors to speak directly to Kelvin Davis when requesting information or documentation pertinent to the project. [Plaintiff] was present during this conversation at which time she seemed agitated but I thought nothing [of] it at the time. My instruction . . . was at the behest of . . . . Davis [who] had requested that any requests for information be funneled through him and follow the proper chain of command.

(*Id.* at 72-73.) Less than thirty minutes later, plaintiff sent another email to upper management, saying: "Kelvin continues to wear no gloves while walking around the worksite, which is exactly what I was doing. I was conducting a safety walk down. I was NOT working as a Welder, Welder's Helper, or Fire Watch. I was following my supervisor's example, so why am I being targeted?" (*Id.* at 73.)

At 1:30 p.m. on May 24, 2010, plaintiff again met with Howe, who emphasized that she needed to follow Davis' instructions. (*Id.* at 75.)

Just before five o'clock on May 24, 2010, plaintiff responded to a request Davis made three days earlier that she "develop a punch list" for the contractor that included her safety inspection findings, by saying: "I believe [Argonne] requires tracking of serious [safety] issues in iCatch, not on a punch list . . . . I don't have access to iCatch, but I can follow LMS-PROC-4 Corrective and Preventive Action to create the [safety inspection] list for you." (*Id.* at 78.)

At 5:18 p.m., Davis emailed plaintiff: "When you are observing work on the 330 project you must comply with the JSA. If you are observing welding and cutting activities you must had [sic] the same PPE as the work group you are observing. For general work activities (no hands on work) gloves are not required." (*Id.*) Eight minutes later, plaintiff responded:

> I re-read the JSA and it does not say that I need to wear leather gloves. The [Argonne] PPE procedure is based on exposure to the hazard. As an observer, I am not exposed to the same hand hazards as the employee doing the work. You observe employees doing work with leather gloves, yet you do not wear them.
>
> I will wear leather gloves, but your expectation is not clear, or consistent with my experience at [Argonne], or anywhere else I've worked as a safety professional.

(*Id.* at 79.)

Plaintiff was out sick on May 25, 26, and most of May 27, 2010. (*Id.* at 80.) However, on May 25, 2010, she submitted on-line complaints to the Department of Justice Civil Rights Center and the Recovery Act Fraud Center, recounting her disputes with Davis and saying her complaints were being ignored by Argonne. (*Id.* at 80-81.)

On June 1, 2010, plaintiff sent two complaints to Argonne's safety department, the first saying that the contractors on site were told not to follow her instructions, and the second recounting the leather glove dispute. (*Id.* at 91-96.) Later that day, Matton told plaintiff she "should give D&D a chance to resolve her complaints before going outside the department." (*Id.* at 98.) Plaintiff

8

told Matton that she "had serious concerns about safety" on the site. (*Id.*) Afterward, she forwarded to him the complaints she had lodged with Department of Justice and the Recovery Act Fraud Center. (*Id.* at 104-07.)

At 4:00 p.m. on June 1, 2010, defendant fired plaintiff citing her failure to arrive on time, her refusal to go to Fellhauer's office as Davis directed, her refusal to wear PPE on site and her misuse of work time by failing to spend adequate time in the field as Davis had directed. (*Id.* at 107.)

Later that day, plaintiff called OSHA, but was told she was not subject to its whistleblower regulations, and submitted complaints of harassment, discrimination and retaliation to the web sites of the EEOC and the Department of Energy. (*Id.* at 108-111.)

On July 22, 2010, plaintiff filed an EEOC charge against Argonne alleging sex, age, and gender discrimination, harassment and retaliation, which she amended on August 22, 2010. Thereafter, the EEOC issued her a right to sue letter, and this suit followed.

**Discussion**

To prevail on a summary judgment motion, "the movant [must] show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At this stage, we do not weigh evidence or determine the truth of the matters asserted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). We view all evidence and draw all inferences in favor of the non-moving party. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000). Summary judgment is appropriate only when the record as a whole establishes that no reasonable jury could find for the non-moving party. *Id.*

Plaintiff alleges that Argonne discriminated against her on the basis of her age and sex when she worked in AGHCF and on the basis of her age, sex and race when she worked in D&D. To defeat Argonne's motion on these claims, plaintiff must offer evidence that shows Argonne subjected her to an adverse employment action because of her membership in a protected class. *Hester v. Ind. State Dep't of Health*, __ F.3d __, 2103 WL 4034397, at *3 (7th Cir. Aug. 9, 2013). She can do so by using: (1) the direct method of proof, *i.e.*, offering evidence of suspicious timing or ambiguous comments that suggest bias, showing that defendant gave "systematically better treatment" to similarly situated employees outside of the protected class or replaced her with one for incredible reasons; (2) or the indirect method proof, *i.e.*, showing that defendant subjected her to an adverse employment action, though she was meeting its legitimate performance expectations, but did not do so to a similarly-situated employee outside of the protected class, and gave an incredible reason for doing so. *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 719-21, 724 (7th Cir. 2005).

With respect to discrimination in AGHCF, plaintiff argues that defendant treated Kurt Salter, a younger, male nuclear project safety manager, more favorably by: (1) allowing him to study for his industrial hygiene certification ("IHC") during the work day; (2) discouraging him from applying for the D&D job so he could become the EHS manager in AGHCF after plaintiff went to D&D; and (3) making him acting EHS manager and including him in management meetings. However, she offers nothing but hearsay and speculation to support her contention that Salter is substantially younger than she, used work time to study or was discouraged from applying for the D&D job. (*See* Def.'s Ex. B, Pl.'s Dep. at 78 (stating that Salter "is like 35, I think"); *id.* at 80 (stating that Salter obtained the IHC in October 2009, which was a month *before* she started working at AGHCF, but

10

"[o]ther people saw [him studying at work] and it was commented on"); *id.* at 96 (testifying that Salter told her an AGHCF supervisor told him not to apply for the D&D job).) Moreover, the record shows that Salter had worked at Argonne longer than plaintiff and had or was about to get his IHC when he was chosen – by Cynthia Rock, a forty-three-year-old woman – to be the acting EHS manager. (*See id.* 79-80; Pl.'s Ex. A, Applicant Information at ANL/B9712, 9762; Def.'s Ex. K, Rock Aff. ¶ 3.) Further, Rock testified that: (1) she chose Salter because of his tenure and performance at Argonne and his possession of an IHC, which she thought "would be useful in that job"; (2) the ESH manager was among those who regularly attended management meetings, and Salter did so in that capacity; and (3) plaintiff was not included in those meetings because "we did not regularly discuss issues that pertained to her duties and if something relevant did come up, instructions were relayed to [plaintiff] through her supervisors." (Def.'s Ex. K, Rock Aff. ¶¶ 5-6.) In short, plaintiff has not raised a triable issue of fact as to whether her alleged treatment at AGHCF violated Title VII or the ADEA. Accordingly, defendant's motion for summary judgment on these claims is granted.

Plaintiff claims that she suffered both discrimination and retaliation in D&D, that: (1) she had to spend her first week in an office with a tiny desk, no computer and no phone because a fully-equipped office nearby was reserved for a white, male colleague who had not yet started; (2) Argonne denied her educational assistance benefits that it provided to younger, non-white and/or male employees; (3) defendant gave Davis, an African-American man, a supervisory position in D&D, for which she was qualified and he was not; (4) Argonne subjected her to sexual harassment when she worked in D&D; (5) Argonne fired her from the D&D job because of her sex; and (6)

11

Argonne retaliated against her for her complaints of discrimination. The evidence does not create a triable fact issue as to any of these claims.

Plaintiff's first claim is doomed by her admission that defendant gave her necessary office equipment within a week of her starting in D&D. (*See* Def.'s Ex. C, Pl.'s Journal at 25; Def.'s Ex. B, Pl.'s Dep. at 154-55.) While a week without that equipment may have been annoying, it does not constitute an actionable adverse employment action. *See Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996) ("[N]ot everything that makes an employee unhappy is an actionable adverse action."); *Spring v. Sheboygan Area Sch. Dist.*, 865 F.2d 883, 885 (7th Cir. 1989) (stating that an adverse job action is one that causes "a *materially adverse* change in the terms or conditions of . . . employment") (emphasis original); *see also Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993) ("A materially adverse change might be indicated by a termination in employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation."). Consequently, any Title VII or ADEA claim based on the temporary lack of office equipment fails.

Plaintiff's claim that Argonne discriminated in its provision of educational assistance benefits is also easily dispatched. She testified that: (1) no one at Argonne told her she could not receive benefits; (2) she does not "know of any" [non-white] employee "who received educational assistance benefits in their first year" of employment with Argonne; and (3) she does not know the ages of Cindy Rock, George Mosho and Jeff Alicz (both white men) or how long each had been employed by Argonne when they allegedly received such benefits. (Def.'s Ex. B, Pl.'s Dep. at 252-56.) Because the record does not suggest that Argonne denied plaintiff educational assistance

benefits or gave them to a similarly-situated non-white, younger and/or male employee, Argonne is entitled to summary judgment on this claim.

Plaintiff fares no better with her claim that she was discriminatorily denied the D&D supervisory job. Lacking direct evidence to support this claim, plaintiff must first establish a prima facie case of discrimination by showing, among other things, that "[s]he applied for and was qualified for the position" and Argonne gave the job "to someone outside of the protected group who was not better qualified than [she]." *Grayson v. City of Chic.*, 317 F.3d 745, 748 (7th Cir. 2003). Plaintiff admits that she did not apply for the job and offers no evidence to suggest that Davis was equally or less qualified for it than she. (*See* Def.'s Ex. B, Pl.'s Dep. at 257.) Accordingly, the Court grants Argonne's motion on this claim.

Plaintiff also asserts that she was harassed on the basis of her sex while at D&D. To proceed on this claim, plaintiff must offer evidence that suggests the alleged harassment was "both subjectively and objectively so severe or pervasive as to alter the conditions of her employment and create an abusive working environment." *Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 645 (7th Cir. 2005) (quotation omitted). To determine whether the environment was objectively hostile, the Court considers "the frequency and severity of [the] conduct, whether it [was] threatening and/or humiliating or merely offensive, and whether the harassment unreasonably interfere[d] with [plaintiff's] work." *Id.* (quotation omitted). "The workplace that is actionable is one that is hellish." *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1013 (7th Cir. 1997) (quotation omitted).

The conduct plaintiff deems harassing is: (1) Davis' failure to give her a tour of D&D before she started working there; (2) defendant's assigning her to an unequipped office when a fully-equipped office was unoccupied; (3) defendant's failure to provide her with a full-size desk,

13

computer and telephone until her second week of work; (4) Davis' "storming out" of her office on her third day at D&D and telling her she should go back to AGHCF; (5) Davis' pressuring her to complete her D&D training; (6) Davis' "storming out" of a meeting six weeks later, after she contradicted his PPE instructions, and telling her to meet him in Fellhauer's office rather than going to find DO Butts; (7) Davis' insistence that she wear leather gloves to observe welding; (8) Davis' direction that she spend seventy-five percent of her time doing field inspections; (9) Fellhauer's "girls" comment, and the fact that he scowled at her in the hall one day; and (10) DO Butts' and Howe's failure to stop Davis' and Fellhauer's alleged actions and their admonitions that she follow Davis' instructions. However, these alleged incidents were sporadic, non-threatening and did not unreasonably interfere with plaintiff's work. Thus, they did not, as a matter of law, create an objectively hostile work environment, a prerequisite to an actionable harassment claim. *See Whittaker*, 424 F.3d at 645.

Having no direct evidence of Argonne's discriminatory motive, to proceed on her termination claim plaintiff must offer, among other things, evidence that suggests she was fired despite having satisfactory job performance. *See Bennington v. Caterpillar Inc.*, 275 F.3d 654, 659 (7th Cir. 2001). Even viewed in her favor, however, the only reasonable inference the record supports is that she was not meeting Argonne's legitimate expectations. In fact, there is no dispute that all of the following occurred during her six-week tenure with D&D: (1) plaintiff reported to work more than three hours late on her first day and immediately complained about her office assignment; (2) she spent most of her first week finishing work from AGHCF and preparing for a volunteer project; (4) during her second week, she ignored Davis' instruction to meet him in Fellhauer's office, which Davis and DO Butts both deemed insubordination; (5) two weeks later,

14

she asked to be excused from a meeting with Employee Relations Manager Howe, who was asking about the timing of events during her first few weeks with D&D, because of illness and then did not reschedule it when she returned from sick leave a week later; (6) plaintiff disputed the PPE requirements Davis set for fire watch employees; (7) plaintiff disagreed with Davis' instruction that she wear leather gloves to observe welding and repeatedly told him and others that the glove requirement was unnecessary; (8) she repeatedly complained about Davis' expectation that she spend most of her time doing inspections in the field; and (9) she responded to Davis' instruction to develop a punch list by saying that Argonne "requires tracking of serious [safety] issues in iCatch, not on a punch list." (Def.'s Ex. B, Pl.'s Dep. at 117-19, 125-127, 133-44, 163-74, 179-81, 184-200, 220-21; Def.'s Ex. C, Pl.'s Journal at 3-15, 32-33, 49-53, 61-63, 68-69, 71-73, 78-79.) Given this undisputed evidence, plaintiff has not created a genuine issue for trial on her termination claim.

Finally, plaintiff alleges that Argonne retaliated against her for her complaints of discrimination. To defeat Argonne's motion on this claim, plaintiff must offer evidence that: (1) she engaged in statutorily protected activity, suffered an adverse employment action and the two are causally connected; or (2) she was meeting Argonne's legitimate expectations, she engaged in statutorily protected activity, she suffered an adverse action and similarly situated employees who did not do so were treated more favorably. *Smith v. Lafayette Bank & Trust Co.*, 674 F.3d 655, 657-58 (7th Cir. 2012). Having determined that plaintiff was not the victim of harassment, the only action that could conceivably be retaliatory is her termination. As detailed above, however, plaintiff has not offered evidence that suggests she was terminated for any reason other than poor performance. Accordingly, the Court grants Argonne's motion for summary judgment on plaintiff's retaliation claim.

## Conclusion

For the reasons set forth above, the Court finds that there is no genuine issue of material fact with respect to plaintiff's claims against Argonne, which is entitled to judgment as a matter of law. Accordingly, the Court grants Argonne's motion for summary judgment [57] and terminates this case.

**SO ORDERED.**                                  **ENTERED: September 13, 2013**

_____
**HON. RONALD A. GUZMAN**
**United States District Judge**